IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MONIQUE ROBINSON,                          )
                                           )
            Plaintiff,                     )
                                           )
      v.                                   )        CIVIL ACTION NO. 2:10cv29-SRW
                                           )
MICHAEL ASTRUE,                            )
Commissioner of Social Security,           )
                                           )
            Defendant.                     )

## MEMORANDUM OF OPINION

Plaintiff Monique Robinson brings this action pursuant to 42 U.S.C. § 405(g) seeking

judicial review of a decision by the Commissioner of Social Security ("Commissioner")

denying her application for a period of disability and disability insurance benefits under the

Social Security Act.  The parties have consented to entry of final judgment by the Magistrate

Judge, pursuant to 28 U.S.C. § 636(c).  Upon review of the record and briefs submitted by

the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

## BACKGROUND

On January 23, 2006, when she was thirty-nine years old, plaintiff reported to Dr.

O'Neill Culver complaining of a bad headache around her forehead and eyes, tightness in the

right side of her head and tightness in her throat.  Dr. Culver noted minimal ankle edema and

stated "[t]he back shows no CVA nor ILA tenderness. Neurologically she has 2+

symmetrically reflexes. The rest of the exam is [within normal limits]." He diagnosed

uncontrolled hypertension. Plaintiff returned to Dr. Culver one week later, again with

complaints of headache. She stated that she was also having some trouble with her back.  On examination, Dr. Culver noted that plaintiff as "grossly obese." He stated that her back "shows rather moderate lumbosacral spinous process tenderness w/bilateral sacroiliac joint tenderness." She had "½ + ankle edema." Dr. Culver diagnosed uncontrolled hypertension, chronic low back pain, dependent edema and headaches. (R. 198).

Plaintiff next sought treatment from Dr. Culver nearly six months later, on July 24, 2006. She complained of chest pain associated with left-side body and arm pain. She reported that she had developed a fast heartbeat for several hours and had started to have chest pains. She also reported pain radiating down her left arm.  On examination of plaintiff's neck, Dr. Culver noted a well healed thyroid scar, with "some mild thyromegaly remaining." He again described her as "grossly obese" and stated that her extremities showed "some ½+ ankle edema." He noted that her skin, lymphatics, and back were all within normal limits.  He diagnosed chest pain, hypertension and weakness. Dr. Culver had plaintiff undergo an EKG, which was normal. He ordered blood tests, gave plaintiff a prescription for Ultram for spasms and told her to come back in two days.

Plaintiff did so, returning to Dr. Culver on July 26, 2006.  She complained of recurring episodes of weakness and stated that she was having muscle aches.  Dr. Culver noted that examination of her extremities showed some weakness of the legs bilaterally with "some skin [changes] that appear to be coarse."  He stated that "[t]he neurological exam shows normal reflexes that are 2+ and symmetrical [with] normal motor strength." He noted that her cardiac

enzymes were negative, and that her cholesterol profile, lipid profile and "the rest of the labs are [within normal limits]." Dr. Culver diagnosed hypothyroidism, weakness, and myositis. He ordered a TFH level and told plaintiff to return in one week. (R. 197).

On October 25, 2006, plaintiff had a "barium swallow" test due to complaints of difficulty swallowing (dysphagia), which revealed a mild hiatal hernia and mild esophageal dysmotility. (R. 182). A thyroid uptake and scan performed on the same day revealed no focal abnormality in the left lobe and a small amount of activity in the right neck, suggesting a small residual amount of thyroid tissue following a previous lobectomy. (R. 181). A thyroid ultrasound showed "relative small size of the right lobe of the thyroid gland. There is a tiny cyst in each lobe. Heterogenous solid 13mm nodule in the inferior left lobe of the thyroid gland. (R. 180). On October 31, 2006, plaintiff returned to Dr. Wesley Barry, Jr., for follow-up of her dysphagia.[1] Dr. Barry reviewed plaintiff's testing results. He stated that the nodule on her left side "is not of any particular concern since it is not even noted on the nuclear medicine thyroid scan." He diagnosed mild esophageal dysmotility and indicated that no surgical therapy was indicated. He stated that if she continued to have a problem, she should follow-up with her gastroenterologist. (R. 183).

On December 17, 2006, plaintiff reported to the emergency room at Lakeview Community Hospital complaining of moderate chest pain – six on a scale of ten – which was

---

[1] The treatment notes indicate that plaintiff's "previous note apparently was misplaced. The patient, because of her dysphagia, had a barium swallow, thyroid scan, and thyroid ultrasound." (R. 183).

radiating down her left arm. She had no shortness of breath, no palpitations, and no vomiting, but "some nausea." (R. 244). She was diagnosed with hypertension, chest pain, angina and GERD and advised to follow-up with her primary care physician in two days. (R. 244-245).

The following month, on January 29, 2007 – when she was forty years old – plaintiff protectively filed an application for a period of disability and disability insurance benefits. (R. 132, 151). She alleged that she had become disabled thirteen months earlier, on January 1, 2006, due to back problems, arthritis, high blood pressure and problems with her left hand and arm. She stated that she is unable to stand for any length of time, unable to do a lot of bending due to back problems, and unable to do a lot of lifting due to numbness and weakness in her left hand. (R. 121, 126). In a physical activities questionnaire, plaintiff indicated that she is able to sit, to walk for fifteen minutes, and to stand for ten to fifteen minutes. (R. 144). She stated that her back gives her a lot of problems and her hand and forearm hurt a lot when she tries to do a lot of chores around the house, and that she has a lot of back and arm pain on cold or cloudy days. (R. 144, 147). She noted that her household chores are limited to doing laundry, that she goes to the grocery store once a month with her husband, and that she can carry a light bag of groceries if it weighs less than seven pounds. (R. 146-47). She indicated that she cannot drive while she is taking her medication. (R. 148).

On February 5, 2007, plaintiff returned to Dr. Culver complaining of trouble with her back. She stated that she was having trouble with moving and bending and trying to do her

housework, and that she had pain in her hands, worse on the left than on the right.  On examination of her back, Dr. Culver noted, "The back shows rather moderate lumbosacral spinous process tenderness. Tenderness that extends from the lumbo sacral spine all the way to the thoracic spine. There is noted bilateral sacroiliac joint tenderness as well as Rt sciatic notch tenderness." On examination of plaintiff's extremities, he also noted "tenderness over the volar carpoligament w/palpation, worse on the L than Rt."  He stated that the rest of the exam was within normal limits.  He diagnosed chronic lumbosacral strain, traumatic arthritis of the back, carpal tunnel syndrome bilaterally in her hands, and hypertension.  (R. 196).

The following month, on March 16, 2007, plaintiff returned to Dr. Culver complaining of continued problems with her back.  She stated that she was unable to do housework and that her hands continued to hurt.  Dr. Culver continued to note tenderness of plaintiff's back and her carpal tunnel ligaments.  He diagnosed "1.  Lumbosacral disc [disease].  2. Chronic low back pains 3.  Chronic right sciatic neuralgia, 4.  Bilateral CTS. 5.  URI.  He advised plaintiff to continue taking "her Tylenol she's taking at home which helps her pain," and he prescribed a cough syrup.

On April 9, 2007, plaintiff again reported to the emergency room at Lakeview Community Hospital complaining of mid-epigastric chest pain. The pain improved with administration of a GI cocktail. She was diagnosed with chest pain, probable GERD, and uncontrolled hypertension.  (R. 239-242).

On April 18, 2007, plaintiff reported to Dr. William D. King for a consultative

5

physical examination.  (R. 188-192).  Plaintiff told Dr. King that she has had lower back pain since sometime in the 1980s when she was in a motor vehicle accident.  She stated that the pain "comes and goes," is not aggravated by any position, motion, or activity, and is non-radiating.  She reported that medications do not help and that her back was hurting then. Dr. King noted, however, that "she does not seem to be in any distress." Plaintiff told Dr. King that she had never had any x-rays or tests done, and had not seen an orthopaedic doctor.  She complained of occasional numbness in her left hand and stated that it tingles and sometimes hurts. This also "comes and goes" and is not associated with any activity.

On examination of her upper extremities, Dr. King noted that plaintiff's "shoulders, elbows, wrists, MCP, PIP and DIP joints are all normal with full range of motion" and that there was no evidence of any synovial thickening, tenderness, or abnormalities.  He stated that her grip strength was 5/5 bilaterally, her hand dexterity was normal, sensation to light touch was normal, and that the Tinel sign was negative in both hands. Dr. King noted full range of motion of plaintiff's hips, knees, and ankles and stated that her feet are normal, with no swelling.  Dr. King observed that plaintiff had full range of motion on flexion of her back, that extension of her back is normal, that she "bends over easily and touches her toes" and "straightens up easily." He further noted that her lateral motion and twisting were both normal, and straight leg raises were negative.  She showed normal curvature of her back and "slight excenuation of the lower lumbar lordotic curve."  He noted her gait to be normal, her heel toe walking to be normal, and squatting to be normal. Dr. King observed that plaintiff

"climbs up and down the exam table without difficulty."

On neurologic exam, he noted that plaintiff is "[a]lert and orientated times III," that her "cranial nerves II-XII are intact," her "[deep tendon reflexes] are 2+ symmetrically bilaterally" and that there were "no motor or sensory deficits." Dr. King stated that he had been asked to "indicate the number and location of tendon or trigger points and there are none." He further stated that he had been asked to discuss an assistive device and that the plaintiff does not need one. He added that she denied any seizures, headaches, dizziness, or blackouts. Dr. King's impressions were: (1) lower back pain of unknown etiology with normal back exam; (2) paresthesia of the left hand with normal sensation exam and normal hand exam and negative Tinel sign; (3) hypertension well controlled; (4) moderate obesity; (5) history of GERD and (6) history of partial thyroidectomy. (R. 190). Dr. King concluded:

> Based on these medical findings despite the above mentioned impairments, her ability to do work related activity, such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking and traveling should not be impaired based on a completely normal exam. However, the patient does claim lower back pain and the numbness in her left hand. I can not see any abnormality on her exam.

(R. 191).

Plaintiff's application for disability was denied at the initial administrative level on April 24, 2007. (R. 73-79).

On May 1, 2007, plaintiff again reported to Lakeview Community Hospital emergency room complaining of chest pain moderate without radiation. She stated that it began after she ate a hamburger. She was diagnosed with chest pain, GERD, and constipation. (R. 236-

238).  Plaintiff returned to Dr. Culver on May 16, 2007,  again complaining of trouble with her back.  She stated that she was having trouble sleeping at night and doing housework.  He noted continued tenderness on examination of her back and bilateral carpal tunnel tenderness.  He diagnosed: "1.  Lumbosacral disc [disease] with chronic low back pains. 2.  Chronic Rt sciatic neuralgia. 3.  Bilateral CTS. [and] 4.  HTN."  (R. 196).

On May 31, 2007, plaintiff requested a hearing before an administrative law judge.  (R. 82).  In a disability report she completed in connection with her appeal from the initial denial of benefits, plaintiff stated that sometimes her husband helps her to get dressed and she is not even able to get out of bed on some days.  (R. 158).

On June 20, 2007, plaintiff returned to Dr. Culver complaining of trouble with her back and neck area.  She stated that she was hurting more now.  She also reported problems with her blood pressure.  Dr. Culver diagnosed chronic lumbar disc disease with chronic low back pain, chronic right sciatica neuralgia, bilateral carpal tunnel syndrome, hypertension, and gross obesity.  (R. 195).  Dr. Culver referred plaintiff to Dr. McRae at Southeast Pain Management Center. (R. 193-195).

Plaintiff reported to Dr. McRae on August 6, 2007.  In her intake forms for her initial evaluation, plaintiff reported back pain, left arm pain and difficulty moving her fingers.  She stated that her pain on that day was a level "3" out of "10" and that the lowest level of her pain is a "2." On an average day, her pain is "4," and at the highest it is an "11" on a scale of  ten.  She stated  that  her  pain  interferes  with  every  activity.  (R. 228).  On physical

8

examination, Dr. McRae noted that her gait was normal for her age and that she had muscle strength of 5/5 of her major muscle groups in her upper and lower extremities. He described plaintiff as moderately overweight and in mild to moderate distress. He noted tenderness and pain in the lumbar spine examination and in the sacral coccygeal and pelvic area, mild lordosis, and moderately restricted lumbar flexion and extension, with pain elicited on both. (R. 225). Dr. McRae noted, "On history and physical examination today, she appeared to have mechanical lumbar pain with associated thoracolumbar myofascial pain and possibly carpel tunnel syndrome of the right wrist. (R. 193). Dr. McRae recommended that plaintiff increase her activity and he scheduled her for a one time physical therapy session "for establishment of a daily home exercise program for stretching and strengthening of her thoracolumbar area." He also scheduled her for bilateral facet intervention" stating that it appears that she had "some mechanical pain related to her facets." He told plaintiff to continue with her current dose of Tramadol and to offset her Advil use with Tylenol. He stated that she may need more formal evaluation of her carpal tunnel syndrome with electromyelography and nerve conduction study. (R. 193-194).

On August 14, 2007, plaintiff reported to Dr. McRae for a facet joint/nerve injection. "Lumbar/Sacral 1st Level." (R. 213). The following day, she reported pain of moderate with a pain score of "5." (R. 220-222). On the day of the injection, she reported a pain score of "7" but exhibited "[n]o pain behaviors." Her facial appearance was relaxed, her verbalization was normal, and her mobility and range of motion were within normal limits. (R. 214). Her

gait again was reported to be normal and she had muscle strength of 5/5 in her upper and lower extremities.  Dr. McRae instructed plaintiff to maintain a daily pain diary and to report for follow-up in two weeks. (R. 214-216).

On August 23, 2007, plaintiff reported for physical therapy at Southeast Alabama Medical Center.  (R. 203-205).  At a follow-up visit with Dr. McRae on September 4, 2007, plaintiff noted pain at a level of "5" on a scale of ten.  She was complained of back pain, neck pain, left arm pain and bilateral hip pain. (R. 208). In the history section of his treatment notes, Dr. McRae noted, "Patient is able to perform activities of daily living, complex activities of daily living.  Patient does not require/use any assistive devices. The symptoms of pain improve with rest. The symptoms of pain worse with walking, standing, weight bearing, lifting, daily activities." She reported improvement overall after her bilateral lumbar facet joint injection.  Though she was given a home exercise program from physical therapy, she reported that she had not been able to follow-up with the exercises or with subsequent physical therapy because of the onset of a week long heavy menstrual period.  (R. 208).

Dr. McRae again observed that plaintiff exhibited no pain behaviors, a relaxed facial appearance, normal verbalization and that her mobility and range of motion were within normal limits. (R. 209).  Dr. McRae advised plaintiff to follow-up with physical therapy the following week and increase her activity with her home exercise program. He noted moderate generalized tenderness in her cervical area, thoracic rib area, sacral, coccycgeal, pelvic and lumbar area; he also noted moderate restriction of motion in plaintiff's lumbar flexion,

10

lumbar extension, and lateral rotation.  (R. 210).

On September 14, 2007, plaintiff reported to a neurologist, Dr. E. Ross Clifton.  Dr. Clifton performed an EMG and nerve conduction study on plaintiff's left arm and selected muscles and nerves of the right arm. He determined that the study showed evidence of chronic C5-6 radiculopathy, but no indication of active radiculopathy.  It showed no evidence of carpal tunnel syndrome by nerve conduction velocity criteria, no evidence of neuropathy, and no evidence of cubital tunnel syndrome. (R. 266).

On October 16, 2007, plaintiff returned to Dr. McRae. She complained of bilateral lumbar and hip pain, but reported continued improvement since the facet injection.  She stated that she had been performing her daily home exercise program for three weeks and she reported pain of "7" out of "10" in her hip. She reported that she would undergo an outpatient procedure for a uterine polyp that was causing the excessive menstrual bleeding.  (R. 261). She also reported depressive symptoms and sleep disturbances as well as muscle pain, joint pain, and decreased range of motion.  (R. 262).  Dr. McRae noted "18/18 tender points positive on Manual Tender Point Survey" with "[f]our quadrant involvement." He noted that she had "EMG/NCS evidence of a C5-6 LUE radiculopathy" and stated that he would schedule her for a cervical epidural steroid injection.[2] He also diagnosed unspecified myalgia and myocytis.  He stated she meets criteria for fibromyalgia with diffuse myofacial pain and poor sleep.  (R. 263).

---

[2]  There is no indication in the record that plaintiff had this procedure.

On November 2, 2007, plaintiff had outpatient surgery, a Hysteroscope D & C for her problem of menorrhagia, performed by Dr. A. H. Saville, Jr.  Plaintiff next sought treatment from Dr. McRae on June 10, 2008, eight months after she had last seen him.  She complained of posterior neck pain, posterior thoracic pain, posterior lumbar pain, left arm pain, bilateral knee pain and a frontal headache and left-sided headache. (R. 255).  She reported that she had undergone a D &C and that her abnormal uterine bleeding was much improved.  She reported muscular pain, joint pain, decreased range of motion, generalized muscle weakness and numbness, depressive symptoms and sleep disturbances.  (R. 256).  Dr. McRae again noted 18 of 18 positive trigger points.  Plaintiff's gait was normal, and she exhibited a mildly depressed affect, crying during the exam. Dr. McRae assessed lumbosacral spondylosis without myelopathy, brachial neuritis/radiculitis not otherwise specified, and unspecified myalgias and myocitis.  He again indicated that she "meets criteria for fibromyalgia" and again recommended a cervical epidural steroid injection.  (R. 254-258).

Plaintiff returned to Dr. McRae on July 11, 2008.  She complained that the Cymbalta that he had started her on at her previous visit made her feel drowsy. She stated she had considered the cervical epidural steroid injection but wanted to try medications first. (R. 248).  She reported diffuse pain related to fibromyalgia and cervical radiculopathy. She reported a depressed mood, exercising and stretching daily, and that she takes Tramadol.  (R. 248).  Plaintiff rated her pain level as "5" on a scale of ten.  (R. 249).  The doctor noted that she was sighing frequently, but that her mobility and range of motion were within normal

limits.  (R. 251).  He further noted that she was in no acute distress. (R. 252).  He continued the same diagnoses, and noted she is not interested at the present time in the "CESI."  He started her on a different medication, Gabapentin, and advised her of potential interaction between Tramadol and Cymbalta and the need to minimize the Tramadol.  (R. 252).

On August 20, 2008, plaintiff returned to Dr. Culver for the first time since June 20, 2007, fourteen months previously.  She reported a history of fibromyalgia, cervical radiculopathy, trouble with her back and legs, and depression.  He noted ½+ ankle edema, moderate lumbosacral spinous process tenderness, interscapular tenderness with bilateral shoulder tenderness, and several areas of tenderness along the posterior back.  He diagnosed fibromyalgia, cervical radiculopathy, lumbar spondylosis, depression, obesity and GERD. He prescribed Xantac and Ultram for pain.

Several weeks later, on October 1, 2008, Dr. Culver completed a clinical assessment of pain form.  He circled responses to indicate that "Pain is present to such an extent as to be distracting to adequate performance of daily activities or work," that "physical activity such as walking, standing, sitting, bending, stooping, moving of extremities, etc." would result in "[g]reatly increased pain and to such a degree as to cause distraction from tasks or total abandonment of tasks."  He circled the response to indicate that "Drug side effects can be expected to be significant and to limit effectiveness due to distraction, inattention, drowsiness, etc."  (R. 303).  He also completed a medical source statement, indicating that plaintiff can  lift ten pounds occasionally to six pounds frequently, sit for two hours in an

eight hour day, and stand or walk for three hours in an eight hour day.  He indicated that she would need one hour of rest during an eight hour work day, in addition to regular breaks, that she does not require an assistive device to ambulate, and that she should avoid dust fumes, gases, extremes of temperature, humidity and other environmental pollutants because she "has problems breathing."  He checked blocks to indicate that: plaintiff can never bend or stoop, reach overhead, or work around hazardous machinery; that she can only rarely do pushing and pulling movements with arm or leg controls, climbing, or fine manipulation; and that she can occasionally perform gross manipulation and operate a motor vehicle. He estimated that she would be absent from work as a result of her impairments or treatments more than four days per month.  (R. 304).  In response to a question asking for the medical basis and diagnosis for the restriction, he wrote "cervical radiculopathy, fibromyalgia, lumbar spondylosis, obesity, GERD, depression, antalgic gait, SOB."  (R. 305).  When asked to list "objective evidence of pain, he noted that he had seen an antalgic gait and local tenderness. He rated her pain as moderate.  He stated that she had been functioning at the level described for more than two and a half years, and that she was taking medication that would adversely affect her ability to work, specifically, anti-inflamatories and narcotics. He wrote that she is "unable to engage in work-related activity."  (R. 305).

    An ALJ conducted a hearing on November 18, 2008. (R. 26-52). Plaintiff first testified that she left her job working for Saunder's Medical as an oxygen technician due to her disability.  She stated that she was having trouble with her back and had to carry the

oxygen, which weighed eight pounds, and the machines, which weighed fifteen to twenty pounds. (R. 31-32). She also testified, however, that she was "let go" because her employer was cutting back on employees. (R. 32).[3] She testified that she had been going to school taking classes in child development for the previous year, carrying a part-time course load. (R. 32-33). She testified that she does not go to school full time because she cannot sit up in the chairs for very long, and because of her medication. (R. 34). She is pursuing a degree in early childhood development and stated that it would permit her to work in a preschool or daycare. (R. 34). She testified that she has a good attendance record at school, is getting all "A"s, and was inducted into Phi Beta Kappa. (R. 35). She further testified that her schooling would probably take longer than four years and that she goes to school just "to try to do something for [herself], because [she] stay[s] depressed a lot." (R. 35). She stated that her pain management physician, Dr. McRae, prescribed an anti-depressant but did not refer her to a psychologist or psychiatrist. (R. 36). Plaintiff testified that she has pain all of the time in her left arm and that Dr. McRae diagnosed fibromyalgia. (R. 36). She stated that, when she was working as a medical oxygen technician, she was able to go to work as scheduled. However, she did not believe that she could do that work anymore. (R. 37). Her left arm goes numb, but her right arm is okay. (R. 38). She testified that she can stand for about thirty minutes, sit for about thirty minutes, walk on the treadmill for about ten minutes, and

---

[3] Plaintiff reported past work as a production worker for a company that made automobile parts, as a private housekeeper and babysitter for a special needs child, and as a medical supply technician. (R. 136-40).

lift about five pounds.  She testified that she was getting steroid shots in her back but that they did not seem to help, and that the pain management did not help.  (R. 38-40).

Plaintiff testified that her medications make her nauseous, drowsy, and sleepy.  On a typical day, she stays at home when she is not in class. She watches television and reads books and, sometimes, her husband takes her out for a ride because she is depressed.  (R. 40). She is able to feed and dress herself and take care of her own hygiene.  She uses a computer at home about five hours a week. (R. 41).  She cooks sometimes and folds clothes but does not wash dishes, sweep, vacuum, or do any yard work.  (R. 41).  She is able to stay on her computer for about forty-five minutes before she has trouble.  She testified that her teachers are aware of her medical problems so they allow her to come and go as she feels necessary. (R. 43).  She testified that she has pain every day and that it is constant.  She stated that her pain level "most of the time" is at a level of nine on a scale of ten.  (R. 43).  She testified that her lumbar steroid injections gave her relief by taking the edge off, but that it lasted for only about an hour.  (R. 44).  She testified that she gets three hours of sleep a night.  (R. 45).  She spends two to three hours each day lying down.  (R. 46).

A vocational expert, Barry Murphy, testified at the hearing. Before she questioned the VE about plaintiff's case, the ALJ asked him, "Do you understand that if you give me an opinion which conflicts with the information contained in the <u>Dictionary of Occupational Titles</u> that you need to advise me of the conflict and the basis for your opinion?" He responded that he did.  (R. 47).  He testified that plaintiff's previous work as a medical

supply technician was medium and semi-skilled, and that her work as an aide for the autistic child was light and semi-skilled. In response to the ALJ's hypothetical question, the vocational expert testified that the hypothetical person described could not do plaintiff's past work but could perform sedentary, unskilled work such as an order clerk, surveillance system monitor, and a "call-out operator," which he explained was a telemarketing type of job.  In his second hypothetical question, the ALJ added mental limitations and asked whether the hypothetical individual could perform all of the jobs previously mentioned or any other jobs and the VE responded that such a person could perform all of the jobs he had previously identified, in the same numbers that he had previously identified.  (R. 48-49).  The ALJ asked the VE if his answers were consistent with the information contained in the Dictionary of Occupational Title and the VE responded that they were.  (R. 49).  The ALJ asked a third hypothetical question, based on the form completed by Dr. Culver.  The VE testified that a person with the limitations identified by Dr. Culver could not perform plaintiff's past work or any other work.  (R. 50).

The ALJ issued an opinion on January 20, 2009.  (R 11-25).  She determined that plaintiff meets the insured status requirements of the Social Security Act through December 31, 2011.  She further determined that the plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 1, 2006.  (R. 13).  She found that plaintiff has severe impairments of fibromyalgia syndrome, back impairments of lumbar spondylosis and cervical radiculopathy, and depression.  (R. 14).  She found that plaintiff does not have an

17

impairment or combination of impairments that meets or medically equals a Listing. (R. 16).

The ALJ determined that plaintiff has the following residual functional capacity:

> to perform light work as defined in 20 C.F.R. 404.1567(b) except claimant can lift 10 pounds frequently primarily with the right upper extremity; claimant can sit, stand and walk for 6 hours in an 8-hour day with normal breaks; claimant is limited to occasionally climbing stairs or ramps, balancing, stooping, kneeling, crouching, or crawling; claimant is limited to never climbing ladders, ropes or scaffolds; claimant can rarely reach with the left upper extremity; claimant is further limited to understanding, remembering, and carrying out short simple instructions.

(R.18). The ALJ concluded that plaintiff is unable to perform any of her past relevant work. (R. 23). However, she determined, based on the VE's testimony, that plaintiff can perform other work as an order clerk, which is sedentary and unskilled, a surveillance system monitor, also sedentary and unskilled and a call-out operator, also sedentary and unskilled. (R. 24). She stated, "Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (R. 24). The ALJ concluded, therefore, that the plaintiff had not been under a disability as defined in the Social Security Act from January 1, 2006 through the date of the decision. (R. 24).

On November 13, 2009, the Appeals Council denied plaintiff's request for review (R. 1-4) and, therefore, the ALJ's decision stands as the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner.

18

Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings.  Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court.  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

Plaintiff raises two issues in her appeal to this court. She contends that the Commissioner's decision is due to be reversed because the vocational expert's testimony conflicts with the Dictionary of Occupational Titles and the conflict was not resolved during the hearing. Plaintiff points out that the DOT indicates that individuals limited to understanding, remembering and carrying out only simple, short instructions can perform at the general educational development ("GED") reasoning level of one, and that the jobs noted by the VE require individuals to have a GED reasoning level of three.  Plaintiff argues, therefore, that the VE's testimony that plaintiff could perform jobs as an order clerk,

surveillance system monitor, and call-out operator conflicts with the DOT and that – according to Social Security Ruling 00-4p – the conflict should have been resolved before the ALJ could rely on the vocational expert's testimony.

The ALJ asked the vocational expert at the hearing whether his testimony was consistent with the DOT, and he responded that it was. Even assuming that the VE were wrong regarding the consistency, the ALJ was entitled to rely on the testimony. Further, the law in the Eleventh Circuit is that the ALJ is entitled to rely on vocational expert testimony even when it conflicts with the Dictionary of Occupational Titles. Jones v. Apfel, 190 F.3d 1224 (11th Cir. 1999). Plaintiff argues that SSR 00-04p is controlling and post-dates the decision in Jones, *supra*. However, the Eleventh Circuit has recently reaffirmed the holding of Jones. See Hurtado v. Astrue, 2011 WL 1560654 (11th Cir. Apr. 25, 2011); Jones v. Astrue, 2011 WL 1490725 (11th Cir. Apr. 19, 2011). Plaintiff's argument is, therefore, without merit.

Plaintiff further contends that the Commissioner's decision is due to be reversed because the ALJ failed to accord adequate weight to the opinion of plaintiff's treating physician, Dr. Culver. "If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight." Roth v. Astrue, 249 Fed. Appx. 167, 168 (11th Cir. 2007)(unpublished opinion)(citing 20 C.F.R. § 404.1527(d)(2)). "If the treating

physician's opinion is not entitled to controlling weight, . . . 'the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.'" Id. (citing Crawford v. Commissioner, 363 F.3d 1155, 1159 (11th Cir. 2004)). "If the ALJ finds such good cause and disregards or accords less weight to the opinion of a treating physician, he must clearly articulate his reasoning, and the failure to do so is reversible error." Pritchett v. Commissioner, Social Security Admin, 315 Fed. Appx. 806 (11th Cir. 2009)(unpublished opinion)(citing MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986)). "When the ALJ articulates specific reasons for not giving the treating physician's opinion controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. Schuhardt v. Astrue, 303 Fed. Appx. 757, 759 (11th Cir. 2008)(unpublished opinion)(citing Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005)).

The ALJ accepted Dr. Culver's assessment "to the extent it supports several of claimant's impairments rise to the level of severe impairments." (R. 21). However, she gave his assessment little weight, finding it to be inconsistent with his own treatment notes, only supported by weak objective evidence, and inconsistent with the course of treatment prescribed to the claimant. (R. 21). Plaintiff argues that the ALJ failed to provide good cause for rejecting Dr. Culver's opinion as expressed in the clinical assessment of pain form and the medical source statement he completed.

In his October 1, 2008, form, Dr. Culver indicated that plaintiff had been functioning

at the very limited level he described for over two and a half years, *i.e*, since before April 1, 2006. (R. 305). The Commissioner observes, correctly, that from the time of her alleged onset date through June 2007, plaintiff saw Dr. Culver only intermittently and was prescribed conservative treatment with medications for her symptoms.[4]  Plaintiff saw Dr. Culver on January 23, 2006, complaining of headache.  Dr. Culver noted no tenderness on examination of plaintiff's back.  She returned a week later, again complaining of headache and reporting, also, that she was having "some trouble" with her back.  Dr. Culver noted, this time, some moderate tenderness.  Plaintiff did not again return to Dr. Culver for almost six months, when she saw him in his office two days apart in late July 2007.  She first complained of chest pain, radiating down her left arm, but had a normal EKG.  Plaintiff's back, again, was noted to be "within normal limits" on examination.  Two days later, she complained of "recurrent

---

[4]  The Commissioner also points to the minimal objective findings found by Dr. King, the consultative examiner, in April 2007.  (Doc. # 12, p. 12)(citing R. 188-91).  The Commissioner further observes that, while plaintiff testified that her pain level typically was a nine on a ten point scale, she indicated on an intake form for her treatment with Dr. McRae in August 2007, that on an average day her pain level was only a four.  (Doc. # 12, p. 11)(citing R. at 43-44 and 228).  Plaintiff rated her back pain as "mild," at a level "3" on that day with normal activities of daily living but restricted recreational activities. (R. 270).  At the administrative hearing, plaintiff also testified that, after the lumbar injections, she had relief "[a]t least for about an hour."  (R. 44).  However, in a September 2007 visit to Dr. McRae, plaintiff reported a pain level of 5/10 that day, "compared with on average 3/10 while more sedentary this week" and she also reported "improvement overall after he bilateral lumbar facet joint injections." (R. 208).  In October 2007, plaintiff reported "continued improvement since the facet injections" but "7/10 pain in her hips."  At her next visit with Dr. McRae eight months later, in June 2008, she rated her pain level at "7" (R. 257), but also reported that medication improved her pain level from "6" to "4." (R. 255).

episodes of weakness."

After the two visits in late July 2006, plaintiff did not again return to Dr. Culver until after she filed her application for disability six months later.  (R. 196-98).  In four office visits in February, March, May and June of 2007, plaintiff complained of back pain and tenderness, and pains in her carpal tunnel ligaments bilaterally, and – while Dr. Culver diagnosed lumbar disc disease and carpal tunnel syndrome – he did so without ordering objective testing (R. 196).[5]  In the sixteen months between the June 20, 2007 office visit and Dr. Culver's completion of the pain and medical source statement forms on October 1, 2008, he saw plaintiff only *once*, on August 20, 2008.  (R. 306).  Thus, the reasons articulated by the ALJ for discrediting the opinion expressed by Dr. Culver in the forms – *i.e.*, that it is inconsistent with his own treatment notes, only supported by weak objective evidence, and inconsistent with the course of treatment prescribed to the claimant – are supported by substantial evidence and provide good cause for rejecting Dr. Culver's opinion of disabling functional limitations.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and proper application of the law.

---

[5]  When plaintiff had a nerve conduction study performed by a neurologist in September 2007, it showed no evidence of carpal tunnel syndrome, cubital tunnel syndrome, or radial neuropathy (R. 266). While the EMG performed the same day showed evidence of chronic cervical radiculopathy, there was no indication of active radiculopathy at that time.  (Id.)

Accordingly, the decision is due to be AFFIRMED.  A separate judgment will be entered.

DONE, this 27th day of June, 2011.


/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

24